# In the United States Court of Federal Claims

No. 22-768
(Filed: October 16, 2023)

```
**************************************
RANCHO DE DIAS ALEGRES LLC, et al.,    *
                                       *
                Plaintiffs,            *
                                       *
        v.                             *
                                       *
THE UNITED STATES,                     *
                                       *
                Defendant.             *
**************************************
```

*Kenneth E. McNeil* and *Kathryn Hoek*, Susman Godfrey LLP, Houston, TX, counsel for Plaintiffs. With whom were *Roger J. Marzulla* and *Nancie G. Marzulla*, Marzulla Law, LLC, Washington, DC, of counsel.

*Matthew P. Rand*, *Elizabeth R. McGurk*, *Dustin J. Weisman*, and *Samantha G. Peltz*, U.S. Department of Justice, Environmental & Natural Resources Division, Natural Resources Section, Washington, DC, counsel for Defendant.

## OPINION AND ORDER

**DIETZ, Judge.**

Rancho de Dias Alegres LLC and owners of an adjoining ranch (collectively "Rancho") bring this suit seeking damages for an alleged taking under the Fifth Amendment of the United States Constitution. The government moves to dismiss Rancho's complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), asserting that Rancho alleges a tort rather than a taking. For the reasons stated below, the Court finds that Rancho has plausibly alleged a taking within this Court's jurisdiction. Accordingly, the Court **DENIES** the government's motion to dismiss.

## I.   BACKGROUND[1]

Two adjoining ranches, the "jewels of the Gallinas Canyon area," sit on the edge of the Santa Fe National Forest near Las Vegas, New Mexico. [ECF 1] ¶¶ 6, 25. The ranches are

---

[1] The facts in this background are obtained from the parties' briefings and attachments. The parties collectively rely on the Gallinas-Las Dispensas Prescribed Fire Declared Wildfire Review from the Santa Fe National Forest, Southwestern Region ("Wildfire Review"), a government-published review of the Hermit's Peak fire. *See* Compl. [ECF 1] ¶ 34; Def.'s Mot. to Dismiss [ECF 40] at 9. The Court cites to the Wildfire Review attached to the government's motion to dismiss at Exhibit 1 as [ECF 40-1].

located to the south of Hermit's Peak, a mountain in New Mexico, with two rivers running through the properties "in the narrow Gallinas Canyon watershed area." *Id.* ¶¶ 6-7. Collectively, the ranches take up 21,000 acres, acting as "the two signature bookends of the narrow, winding, and beautiful Gallinas Canyon." *Id.* ¶¶ 23-24. They "sit virtually in the shadow of the towering Hermit's Peak." *Id.* ¶ 6.

In May 2000, Las Vegas was subject to a wildfire just west of the Gallinas Watershed that "produced dramatic effects to the [city's] water quality" and raised concern about "the potential effects to water quality of a larger fire within that same watershed." [ECF 40-1] at 14.[2] In response, the United States Forest Service ("USFS") initiated the Gallinas Municipal Watershed Wildland Urban Interface Project Environmental Assessment ("Gallinas EA"), which the USFS finalized in June 2006. *Id.* at 21. The Gallinas EA planned to use prescribed fires as a tool to "address the risk of high-severity wildfires and the risk to values, property, and lives." *Id.* at 14. One issue raised in the Gallinas EA was the risk of escaped prescribed fire, *id.* at 32, and in 2019, the USFS drafted an addendum to the Gallinas EA to address prescribed fires "more safely and effectively," *id.* at 33. However, the addendum was not "finalized or signed." *Id.*

On January 10, 2020, the USFS approved the Gallinas Watershed Prescribed Fire Plan ("prescribed fire plan"). [ECF 40-1] at 34. The plan established a project area that is "about 20,600 acres in size and consists of ponderosa pine forest (about 2,400 acres), mixed conifer forest (about 10,800 acres), spruce-fir forest (about 5,700 acres), and other/aspen (about 1,700 acres)." *Id.* at 15. The USFS divided the project area into "12 prescribed fire units to help mitigate smoke impacts." *Id.* Of those units, the Las Dispensas fire unit "encompasse[d] approximately 1,273 acres" and sat on the eastern edge of the Gallinas Prescribed Fire project area. *Id.* at 15-16. The Las Dispensas fire unit "was further divided into 10 prescribed fire sub-units to provide greater implementation flexibility." *Id.* at 15. The prescribed fire plan set acceptable weather and fuel moisture parameters for proceeding with the prescribed fire. *Id.* at 39. There were also mitigation strategies to cease ignitions if the conditions throughout the day exceeded those parameters. *Id.*

On March 24, 2022, following preparation work, the USFS authorized the prescribed fire to take place from April 1-30, 2022. [ECF 40-1] at 22. The years leading up to the prescribed fire saw "[t]raditional monsoon precipitation . . . significantly below the historic average in 2019 and 2020." *Id.* at 17. "Warm temperatures and dry precipitation anomalies" led to "lower humidity recoveries and led to drier fuels and longer daily burning periods." *Id.* at 19. The project area did, however, receive snow the weekend prior to the prescribed fire. *Id.* at 22. The prescribed fire plan identified snow "as mitigation for long-term drought because there was a perception that fuels were moist." *Id.* The week of the prescribed fire, "personnel sampled live and dead fuel moistures[,]" finding that fuel moisture values had fallen since prior observations. *Id.* Additionally, an email was sent to the Regional Smoke Coordinator and Predictive Services Meteorologist two days prior to the prescribed fire expressing "potential concerns regarding forecasted winds." *Id.* The response "indicated that there was a solid burn window that would not be limited by the expected winds." *Id.* Weather observations the day before the prescribed fire at the intended start time for ignition were within the parameters of the prescribed fire plan. *Id.* at 23; *id.* at 44.

---

[2] All page numbers in the parties' briefings refer to the page numbers generated in the CM/ECF system.

On the morning of April 6, 2022, "resources were shown enroute to the prescribed fire unit." [ECF 40-1] at 23. The fire unit crew consisted of two firing groups and two holding groups, split into an Alpha and a Bravo division. *Id.* Each division included a Firing Boss, a Firing Boss Trainee, and a Holding Boss, all of which reported to the Prescribed Fire Burn Boss, who was "responsible for supervising a prescribed fire from ignition through mop-up." *Id.* at 82. The Firing Boss was "responsible for supervising and directing ground and/or aerial ignition operations." *Id.* at 83. The Firing Boss Trainee was a "fully qualified trainee." *Id.* at 81. The Holding Boss "manage[d] the holding crew . . . [which was] responsible for keeping the fire within the pre-designated prescribed fire unit." *Id.* at 84. The "Alpha Firing and Holding [groups] were assigned to work the southern end of the unit" and the "Bravo Firing and Holding were assigned to work from the test fire site north and east." *Id.* at 23. The Bravo Firing Group led "the prescribed firing operation to create a buffer to the north side . . . of the slope due to heavier concentrations of dead and down fireline-prepared fuels inside of the unit about 30 feet inside the fireline." *Id.*

The USFS obtained a National Weather Service ("NWS") weather observation prior to the test fire. [ECF 40-1] at 23. At 11:00 A.M., there was a relative humidity of 30% and winds of 3 to 8 miles per hour. *Id.* at 23, 44. The USFS deemed the conditions safe to continue, and the "test fire results were determined successful." *Id.* at 26. Throughout the course of the prescribed fire, the USFS obtained smoke and fire behavior observations. *See id.* The USFS also made weather observations during the prescribed fire. *Id.* At 3:30 P.M., the Bravo Firing Boss decided to hold off on firing "[d]ue to variable and shifting winds." *Id.* at 30. By 3:45 P.M., the Bravo Firing Trainee contacted the "Bravo Firing Boss to advise they would continue ignitions." *Id.* The firing team radioed the Trainee to obtain the Trainee's location and to hold off on igniting more fires. *Id.* The Trainee "relayed that the igniters were already at the [bottom of the slope]. [The] Bravo Firing Boss directed Bravo Firing Trainee not to bring any more fire up the line." *Id.* Shortly thereafter, several small fires outside the perimeter of the main fire ("spot fires") were reported; however, the Burn Boss reported that there were "no holding concerns" and that "all ignition operations had stopped." *Id.*

Even though the USFS stopped ignitions, the prescribed fire grew out of control. *See* [ECF 40-1] at 31. At 4:00 P.M., the USFS observed that the relative humidity was at 10%, winds were ranging from 4 to 8 miles per hour, and wind gusts were moving at 15 miles per hour. *Id.* at 30. Fire behavior observations included "[i]ncreased fire activity and prolonged group tree torching." *Id.* at 31. "At this time[,] the Bravo Firing Boss radioed Bravo Holding Boss with no response." *Id.* By 4:06 P.M., the Burn Boss stated that there were a dozen or so spot fires. *Id.* At 4:15 P.M., the Bravo Firing Boss reported that there were "not enough resources to catch" the frequent spot fires. *Id.* By 4:20 P.M., the wind had shifted in multiple directions, "causing multiple spot fires to the west, north, and east sides of the fireline of Unit 10." *Id.* at 32. By 4:34 P.M., the prescribed fire had headed "north toward Hermit's Peak," and by 4:38 P.M., the USFS declared it a wildfire. *Id.* The USFS named it the "Hermit's Peak wildfire" at 4:50 P.M. *Id.*

The Hermit's Peak wildfire devastated 300,000 acres of land, spread over three New Mexico counties. [ECF 1] ¶ 7. The "jewels of the Gallinas Canyon area," *id.* ¶ 25, were among those affected, with 10,000 of its 21,000 acres "burned entirely to the ground," *id.* ¶¶ 2, 7. The wildfire "appear[ed] to have sterilized the top two feet of ground soil," and the "Tecolote River

3

running through four miles of [the area], [] filled with up to an estimated one foot of dark ash and silt, destroying the quality of that stream." *Id.* ¶ 49. The Gallinas River also suffered similar problems. *Id.*

In a review of the Hermit's Peak wildfire, the government found the following:

> [T]he personnel assigned to the Las Dispensas Prescribed Fire followed their approved prescribed fire plan. There was confidence they were within the approved prescription limits, and they had a plan to suppress the fire and cease ignitions if the prescription parameters were exceeded. However, a post-prescribed fire analysis of fuel and weather revealed that the implementation was occurring under much drier conditions than were recognized. Persistent drought, limited overwinter precipitation, less than average snowpack, fine fuel accumulation–post mechanical treatment, and increased heavy fuel loading after fireline preparation all contributed to increasing the risk of fire escape.

[ECF 40-1] at 11.

On July 15, 2022, Rancho filed its complaint in this Court, alleging that the prescribed fire by the USFS resulted in an inverse condemnation of their ranches. [ECF 1] ¶ 1. Given the nature of the wildfire and the potential for vanishing evidence, the parties agreed to expedited discovery on September 1, 2022. *See* September 6, 2022 Order [ECF 11]. On February 15, 2023, the government moved to dismiss Rancho's complaint under RCFC 12(b)(1). [ECF 40] at 1. The government's motion to dismiss is fully briefed, and the Court held oral argument on May 23, 2023. Hr'g Tr. [ECF 59].

## II.     LEGAL STANDARD

Subject-matter jurisdiction is a threshold matter. *See Ministerio Roca Solida v. United States*, 129 Fed. Cl. 140, 144 (2016) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)). When considering a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)); *see also Hymas v. United States*, 810 F.3d 1312, 1317 (Fed. Cir. 2016) ("[O]nly uncontroverted factual allegations are accepted as true.").

When the defendant challenges the court's jurisdiction, the plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence. *Groundbreaker Dev. Corp. v. United States*, 163 Fed. Cl. 619, 623 (2023). "[T]he court may consider evidence outside the pleadings to resolve the issue." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572 (Fed. Cir. 1996); *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988) ("If a motion . . . challenges the truth of the jurisdictional facts alleged in the complaint, the district court may consider relevant evidence in order to resolve the factual dispute.").

"The Court of Federal Claims is a court of limited jurisdiction." *Brown v. United States*, 105 F.3d 621, 623 (Fed. Cir. 1997) (citations omitted); *Thune v. United States*, 41 Fed. Cl. 49, 51 (1998). The Tucker Act authorizes jurisdiction in this Court "over claims for money damages 'against the United States founded . . . upon the Constitution . . . in cases not sounding in tort.'" *Moden v. United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005) (quoting 28 U.S.C. § 1491(a)(1) (2000)). The Takings Clause of the Fifth Amendment to the U.S. Constitution is a type of claim within this Court's jurisdiction. *Thune*, 41 Fed. Cl. at 51 (citing *United States v. Causby*, 328 U.S. 256 (1946)). Tort claims, however, do not fall within the purview of this Court's jurisdiction. *Brown*, 105 F.3d at 623 ("[The Court of Federal Claims] lacks jurisdiction over tort actions against the United States."). If the Court determines that it lacks subject-matter jurisdiction, it must dismiss the case. RCFC 12(h)(3); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

### III. DISCUSSION

Rancho asserts that it is entitled to compensation because, "[a]s a result of the U.S. government's actions[,] which constitute [a] taking, approximately 10,000 acres [of their] two ranches were completely burned to the ground, . . . ." [ECF 1] ¶ 2. The government moves to dismiss Rancho's complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1), arguing that "[a]lthough presented as Fifth Amendment takings claims, [Rancho's] claims sound, if at all, in tort and thus fall outside of this Court's limited jurisdiction." [ECF 40] at 9. Upon review of the complaint and the uncontroverted facts in the Wildfire Review, the Court finds that Rancho has plausibly alleged a takings claim within this Court's jurisdiction.

#### A. *Ridge Line* Tort-Takings Test

"Inverse condemnation is a 'shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.'" *Moden*, 404 F.3d at 1342 (quoting *United States v. Clarke*, 445 U.S. 253, 257 (1980)). Although "inverse condemnation is tied to, and parallels, tort law . . . not every invasion of private property resulting from government activity amounts to an appropriation." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (internal citation and quotation marks omitted). Determining whether a claim sounds in tort is "a question of law with factual underpinnings." *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009). In *Ridge Line*, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") developed a tort-takings distinction test that has since been applied to inverse condemnation cases involving RCFC 12(b)(1) motions. *See, e.g., Ministerio*, 129 Fed. Cl. at 146 (holding that plaintiff's claim facially met the requirements of Ridge Line's two-prong test, establishing jurisdiction).

Under *Ridge Line*, Rancho must satisfy two prongs to establish jurisdiction. *See* 346 F.3d at 1355 (holding that appellant "must establish that treatment under takings law, as opposed to tort law, is appropriate under the circumstances"). The first prong concerns intent or causation. *See id.* ("[A] taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'") (quoting *Columbia Basin Orchard v. United States*, 132 Ct. Cl. 445, 450 (1955)); *Hansen v. United States*, 65 Fed. Cl. 76,

5

117 (2005) ("It is in [*Ridge Line*] that the Federal Circuit explicitly recognized and applied the two lines of takings jurisprudence . . . one premised on subjective intent and the other on objective causation."). The second prong measures the magnitude of the government's invasion of the property; that is, whether the government appropriated the property. *Ridge Line*, 346 F.3d at 1356 ("[A]n invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for an extended period of time, rather than inflict an injury that reduces its value."). The government contends that Rancho's complaint "fails to allege sufficient facts" needed to satisfy the two prongs of the *Ridge Line* tort-takings distinction test. [ECF 40] at 10.

### B. *Ridge Line* Prong One

The first prong of *Ridge Line* requires that the government intend to invade a protected property interest or that the asserted invasion is the direct, natural, or probable result of an authorized activity. 346 F.3d at 1355. The government argues that "[a]s to the first prong, [Rancho] cannot establish jurisdiction because [it] do[es] not plausibly allege that, in starting a prescribed burn in a designated fire unit on National Forest land, the United States intended to ignite a wildfire that would spread beyond the unit to [Rancho's] private properties, or that the Forest Service should have foreseen that [Rancho's] injury would necessarily occur." [ECF 40] at 10.

Although Rancho initially argued in its complaint that the government intended to invade its property, it conceded the government's lack of intent during oral argument. *See* [ECF 59] at 41 ("We are not even relying on . . . that first subsection of Prong 1."). Also, Rancho's response brief to the government's RCFC 12(b)(1) motion does not allege intent. *See* Pl.'s Resp. to Def.'s Mot. to Dismiss [ECF 43]. Because the first prong is in the disjunctive, forgoing the intent argument has no impact on Rancho's takings claims. *See Hansen*, 65 Fed. Cl. at 117 (commenting that the first prong's "most notable facet . . . is the fact that the court employed the *disjunctive* ('or') rather than the conjunctive ('and') . . . . The implication of the disjunctive, of course, is that the individual sub-parts (intent *or* causation) are each sufficient grounds upon which to predicate a takings claim.") (emphases in original). Rancho must therefore demonstrate causation by showing that "the asserted invasion is the direct, natural or probable result of an authorized activity" to maintain a takings claim within this Court's jurisdiction. *Ridge Line*, 346 F.3d at 1355 (internal quotation marks omitted).

The Federal Circuit has clarified the meaning of "direct, natural, or probable result" to mean that the "injury must be the likely result of the act, not that the act was the likely cause of the injury, the latter allowing for incidental injuries resulting from a true cause-in-fact to be considered a taking." *Cary*, 552 F.3d at 1377; *see also Hansen*, 65 Fed. Cl. at 115 (observing that the history of tort-takings cases applied tort law foreseeability "as a tool to establish the bounds of proximate causation"). To show that an alleged invasion is the direct, natural, or probable result of an authorized government action, the plaintiff must prove both causation and foreseeability. *See id.* at 1379 ("Foreseeability and causation are separate elements that must both be shown (when intent is not alleged).").

6

### i. *Causation*

Rancho alleges that the damage to its ranches was "the direct, natural, or probable consequence" of the prescribed fire by the USFS. [ECF 1] ¶ 44. Rancho further alleges "[t]he inundation, destruction of, and damage to plaintiffs' real and personal property was substantially certain to result from and/or was the natural, probable, and reasonably foreseeable consequence of the government-induced controlled burn." *Id.* ¶ 62. The government contends that Rancho's allegations "fail to connect the prescribed burn with the injury to its properties." [ECF 40] at 22. It asserts that "[a]t best, Plaintiffs allege that the [USFS] should have foreseen that the Las Dispensas prescribed burn would escape the burn unit and spread into the National Forest." *Id.* at 23.

The Court finds that Rancho has plausibly alleged causation. As noted above, in *Ridge Line*, the Federal Circuit explained that a taking occurs when the government either intends to invade a property or the invasion is the direct, natural, or probable cause of authorized government activity. 346 F.3d at 1355. In other words, "[f]or an injury to be a compensable taking, the court must determine that no break in the chain of causation existed between the suspected government authorized action and the injury." *Cary*, 552 F.3d at 1380. In its complaint, Rancho alleges that the government's initial action, which set off the chain of events, was "[t]he [USFS] initiat[ing] its 'controlled burn' on a steep incline area like Hermit's Peak[.]" [ECF 1] ¶ 29. From that point on, Rancho alleges, the USFS was "unable to control a large number of 'spot fires' beyond the prescribed burn areas[,]" *id.* ¶ 36, which then led to the Hermit's Peak wildfire that eventually "hit [Rancho]—the closest and largest private properties at the foot of Hermit's Peak." *Id.* ¶ 43. Upon examining the facts and drawing all reasonable inferences in favor of Rancho, the Court finds that Rancho has plausibly alleged that the destruction of the ranches was the direct, natural, or probable consequence of the government's controlled burn. *See Cary*, 552 F.3d at 1379 (stating that "[w]herever there is an authorized action, the causation prong is satisfied for any injury which is the direct, natural, and probable result of that action.").

### ii. *Foreseeability*

Rancho further alleges that the USFS's knowledge of the prevailing weather conditions should have forewarned the government that continuing with the prescribed fire could foreseeably result in damage to the ranches. *See* [ECF 1] ¶ 33 (asserting that the weather reports the USFS received on the day of the burn revealed low humidity and high winds which, when combined with "high fuel loads and with highly combustible dry pine trees on a steep slope, was a recipe for disaster"). According to Rancho, "all these conditions existed when the [USFS] chose to initiate the Hermit's peak fire." *Id.* ¶ 32. To demonstrate foreseeability, Rancho alleges that the ranches were proximately located to the site of the prescribed fire. *See* [ECF 43] at 20 ("[T]he conditions on the day of the fire and the location of the Plaintiffs' property pointed to a predictable (probable, natural, or direct) outcome."). Rancho alleges that the ranches were "the closest major propert[ies] hit on the south side of the Hermit's Peak prescribed burn." [ECF 1] ¶ 7. Although further discovery on foreseeability may be warranted, the Court finds that Rancho has plausibly alleged that the damage to its properties was the foreseeable result of the prescribed fire.

As the Federal Circuit noted in *Cary*: "[T]he court must determine that no *break* in the chain of causation existed between the suspected government action and the injury." 552 F.3d at 1380 (emphasis added). The government asserts that "multiple intervening, unexpected changes in the weather broke the alleged chain of causation and made the alleged injury [to Rancho's properties] unforeseeable at the time of ignition." [ECF 40] at 40. The government's allegations, in a vacuum, could establish a break in the chain of causation. However, the Court finds that Rancho has plausibly alleged that the damage to its properties was foreseeable. First, the weather forecast prior to the start of the test fire on April 6, 2022, provided notice of the potential for high winds on that day. *See* [ECF 40-1] at 65 ("20 Foot Winds . . . West winds 10 to 15 mph. Gusts to 25 mph possible."). Moreover, the Wildfire Review states that "[t]he success of meeting the prescribed fire objectives was dependent on this wind direction because the intent was to lead fire away from the wilderness and private property boundaries toward the interior of Unit 10." *Id.* at 43. These facts, when read in a light most favorable to Rancho, provide support for Rancho's allegation that the government was aware of high winds on the day of the prescribed fire.[3] In sum, although questions remain as to the proximity of the ranches to the Las Dispensas fire unit, the effect of the terrain and topographical features of the terrain, and others factors affecting foreseeability, at this stage in the litigation, Rancho has met its burden.

### C.     *Ridge Line* Prong Two

The second *Ridge Line* prong requires that an invasion appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner's right to enjoy their property for an extended period of time. 346 F.3d at 1356. Rancho alleges that "[t]he physical invasion of plaintiffs' properties deprived plaintiffs of real and personal property interests." [ECF 1] ¶ 60. Rancho further alleges that the Hermit's Peak wildfire led to "blight to the property itself, the infrastructure, and the natural surroundings[,]" *id.* ¶ 28, "destroy[ed] the microcosms and seeds below ground[,]" *id.* ¶ 50, and "sterilized the top two feet of ground soil" such that it will be difficult "to ever get the land back into the natural forest condition[,]" *id.* ¶ 49. In response, the government argues that "one or two 'isolated invasions' do not 'rise to the level of a taking.'" [ECF 40] at 32 (quoting *Ridge Line*, 346 F.3d at 1357).

The government's reliance on the fact that the wildfire was a one-time occurrence may be misplaced. *See Arkansas Game and Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012) (holding that an invasion "temporary in duration gains no automatic exemption from Takings

---

[3] In *Bettini v. United States*, the Claims Court found that a plaintiff plausibly alleged a taking where a road the government constructed collapsed. 4 Cl. Ct. 755, 760 (1984). Ruling on the government's motion to dismiss, the court found that it had subject matter jurisdiction over plaintiff's complaint because "[i]t is within the realm of factual possibility that the particular location involved here was such that a mudslide was a clearly foreseeable and probable result of constructing a road, or that the construction which took place was bound to collapse." *Id.* at 761. The court further found that a taking can occur "even where the Government has taken pains to prevent damage." *Id.* at 760 (citing *Berenholz v. United States*, 1 Cl. Ct. 620, 627, *aff'd mem.*, 723 F.2d 68 (Fed. Cir. 1983) (per curiam)). The court explained that "[t]he likelihood of the outcome serves to distinguish conduct which is a taking from that which is tortious." *Bettini*, 4 Cl. Ct. at 760 (quoting *Berenholz*, 1 Cl. Ct. at 628) (internal quotation marks omitted). The court also noted that "where there is a random event induced more by an extraordinary natural phenomenon than by Government interference there can be no taking, even if there is permanent damage to property partially attributable to Government activity." *Bettini*, 4 Cl. Ct. at 760 (quoting *Berenholz*, 1 Cl. Ct. at 626) (internal quotation marks omitted).

Clause inspection."); s*ee also In re Upstream Addicks and Barker (Tex.) Flood-Control Reservoirs*, 138 Fed. Cl. 658, 671 (2018) ("[A] single act of flooding may not be enough . . . [but] it also might be."). An isolated invasion may not rise to a taking, but "[t]he question . . . is whether defendant has appropriated an interest for itself in the subject property—and that inquiry requires an examination of multiple factors, certainly beyond whether [the alleged invasion] has occurred once, twice, or even a dozen times." *Quebedeaux v. United States*, 112 Fed. Cl. 317, 324-25 (2013) (denying motion to dismiss under RCFC 12(b)(6) because "in the court's view, plaintiffs should be given the opportunity to develop the facts in support of their claims via discovery.").

In *Orr v. United States*, the court "conclude[d] that discovery is necessary to determine whether plaintiffs' allegations demonstrate a taking." 145 Fed. Cl. 140, 158 (2019) (denying RCFC 12(b)(6) motion). The court considered plaintiffs' allegations of "los[ing] substantially all of their homes, the business owned by [the plaintiffs], and their personal property" as well as "large sections of the land and riverfront property owned by Plaintiffs, which were 'displaced or permanently removed'" in a one-time flooding event. *Id.* at 157. The court concluded that "discovery is necessary to determine whether plaintiffs' allegations demonstrate a taking, and, therefore, plaintiffs should be given the opportunity to develop facts in support of their claims." *Id.* at 158. *Quebedeaux* also involved a one-time flooding event, where the plaintiffs alleged that "flooding destroyed, damaged, and/or devalued [plaintiffs'] crops, farms, homes, businesses, buildings, structures, equipment, oil and gas wells, fishery waters, and other real and personal property." 112 Fed. Cl. at 320. *Orr* and *Quebedeaux* caution against dismissing the case where discovery may be warranted. *See Orr*, 145 Fed Cl. at 156-57 ("In considering whether to apply the two-part *Ridge Line* test in the context of a motion to dismiss, [the court] has stated '[t]hese multifaceted approaches, heavily imbued, as they are, with factual considerations, strongly militate against the adoption of a bright-line rule that would require this court to dismiss plaintiffs' complaint.'") (quoting *Quebedeaux*, 112 Fed. Cl. at 325). Here, Rancho has plausibly alleged that the government "appropriate[d] a benefit to the government at [their] expense . . . or at least preempt[ed] [their] right to enjoy [their] property for an extended period of time." *Ridge Line*, 346 F.3d at 1356.

## IV.    CONCLUSION

The Court concludes that Rancho has plausibly alleged a taking within this Court's jurisdiction and that, therefore, dismissal for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is not appropriate. Accordingly, the government's motion to dismiss is **DENIED**.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge
